1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  WM. BOLTHOUSE FARMS, INC.,      )   1:10-cv-2322 OWW SKO
   HOUSTON CASUALTY CO., and       )
10 LIBERTY SURPLUS INSURANCE CORP.,)   SCHEDULING CONFERENCE ORDER
                                   )
11              Plaintiffs,         )   Discovery Cut-Off: 8/1/12
                                   )
12      v.                         )   Non-Dispositive Motion
                                   )   Filing Deadline: 8/1/12
13 ECOLAB, INC.,                   )
                                   )   Non-Dispositive Motion
14              Defendant.         )   Hearing Date: 9/7/12 9:00
                                   )   Ctrm. 8
15 _____ )
                                       Dispositive Motion Filing
16                                     Deadline: 8/31/12

17                                     Dispositive Motion Hearing
                                       Date: 10/1/12 10:00 Ctrm. 3
18
                                       Settlement Conference Date:
19                                     8/7/12 10:30 Ctrm. 8

20                                     Pre-Trial Conference Date:
                                       10/29/12 11:00 Ctrm. 3
21
                                       Trial Date: 12/11/12 9:00
22                                     Ctrm. 3 (JT-10 days)

23

24 I.   Date of Scheduling Conference.

25      June 10, 2011.

26 II.  Appearances Of Counsel.

27      Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, LLP

28 by Barry L. Goldner, Esq., and Jeffrey W. Noe, Esq., appeared on

                              1

1 behalf of Plaintiffs.

2     Kirkland & Ellis LLP by Andrew R. Running, Esq., also
3 appeared on behalf of Plaintiffs.

4     Bowman and Brooke LLP by Ryan Nilsen, Esq., and Gregory P.
5 Gilmer, Esq., appeared on behalf of Defendant Ecolab Inc.

6     Troutman Sanders LLP by William D. Burger, Jr., Esq.,
7 appeared on behalf of Plaintiff Houston Casualty Company.

8     Rimac & Martin by Matthew Hickey, Esq., appeared on behalf
9 of Plaintiff Liberty Surplus Insurance Corp.

10 III.   Summary of Pleadings.

11     1.   This case arises out of Plaintiff Bolthouse Farms'
12 purchase and use of Defendant Ecolab's Tsunami 100 antimocrobial
13 process water treatment in the production of Bolthouse's ready-
14 to-eat baby carrots.  Bolthouse claims Ecolab's Tsunami 100
15 caused "early spoilage" of carrots, resulting in over $50 million
16 of business losses.  Ecolab denies Bolthouse's claims, and Ecolab
17 contends Bolthouse's own failure to adequately design, maintain,
18 clean, and sanitize its carrot production equipment created the
19 problems about which it now complains.

20 IV.   Orders Re Amendments To Pleadings.

21     1.   The parties do not anticipate amending the pleadings at
22 this time.

23 V.   Factual Summary.

24     A.   Admitted Facts Which Are Deemed Proven Without Further
25 Proceedings.

26         1.   Plaintiff Wm. Bolthouse Farms, Inc., is a
27 corporation incorporated under the laws of the State of Michigan
28 with its principal place of business in Bakersfield, California.

1      2.   Houston Casualty Company is a corporation
2  incorporated under the laws of the State of Texas and does a
3  general property and casualty business in the State of
4  California.

5      3.   Liberty Surplus Insurance Corp. is a corporation
6  incorporated under the laws of New Hampshire and doing business
7  as a surplus lines carrier in the State of California.

8      4.   Ecolabs, Inc. is a corporation incorporated under
9  the laws of Delaware with its principal place of business in St.
10  Paul, Minnesota.

11      5.   Plaintiff Wm. Bolthouse Farms, Inc. processes and
12  sells fresh food products, including fresh bagged baby carrots.

13      6.   Defendant Ecolab Inc. manufactures and sells
14  cleaning and sanitizing products, including certain products used
15  in the production of food.

16      7.   During the relevant time period, Bolthouse had two
17  processing plants in the Bakersfield area: the "West Plant" and
18  the "East Plant."

19      8.   Beginning in or around 2007, Ecolab marketed to
20  Bolthouse Tsunami 100 as an alternative to chlorine dioxide, the
21  process water treatment Bolthouse had been using.

22      B.   Contested Facts.

23      **Bolthouse**

24      1.   Ecolab offered Bolthouse certain technical support
25  in connection with the purchase of Tsunami 100, including support
26  from its "SEALS Team," which Ecolab describes as "an elite group
27  of highly trained and experienced specialists...."

28      2.   According to Ecolab, Tsunami 100 controls surface

3

1   microbial activity so product spoilage is minimized and shelf
2   life is enhanced.  A longer shelf life would enable Bolthouse to
3   avoid the higher costs for refrigerated truck shipments during
4   the summer season.

5         3.    In May 2009, Bolthouse informed Ecolab that it
6   wanted to replace chlorine dioxide with Tsunami 100 on one of its
7   production lines at the East Plant, which produced baby carrots
8   exclusively (the "North Short-Cut line" or NSC line).

9         4.    Because Tsunami 100 is approximately ten times
10  more expensive than chlorine dioxide, to induce Bolthouse to
11  purchase Tsunami 100, Ecolab told Bolthouse that the higher cost
12  of its product was justified by improved shelf life for baby
13  carrots.

14        5.    Ecolab never warned Bolthouse that there was any
15  risk that Tsunami 100 would actually decrease the shelf life of
16  the carrots being processed, even though studies, including those
17  by Ecolab's own researchers, showed Tsunami 100 was ineffective
18  at controlling the growth of yeast in treated produce and it
19  would decrease the shelf life of carrots.

20        6.    Ecolab also sought to induce Bolthouse to purchase
21  and use Tsunami 100 by representing that Ecolab would provide
22  valuable technical services to Bolthouse related to testing and
23  converting to Tsunami 100.

24        7.    On May 26, 2009, Timm Miller and David Walker
25  (Ecolab's sales and technical representatives) instructed
26  Bolthouse's personnel on the protocol that would be followed in
27  converting the NSC line from chlorine dioxide to Tsunami 100.

28        8.    From June 7 to 15, 2009, Mr. Walker personally

                                 4

1  supervised and directed the conversion of the NSC line from

2  chlorine dioxide to Tsunami 100.  Mr. Walker repeatedly assured

3  Bolthouse personnel that Bolthouse was properly implementing

4  Ecolab's advice and instructions.

5       9.   On or around June 23, 2009, Bolthouse received its

6  first customer complaints of abnormal decomposition.  It quickly

7  determined that all of the abnormally-decomposed carrots had been

8  processed on the NSC line using Tsunami 100.

9       10.  Bolthouse promptly checked its "retain samples"

10  from the NSC line, and discovered that carrots treated with

11  Tsunami 100 had a peculiar odor and were failing at an

12  unprecedented 12 days after processing.

13       11.  Subsequent testing determined that the

14  fermentation odor and the accelerated spoilage were associated

15  with significantly accelerated yeast growth (including the yeast

16  *Candida sake*) on the carrots treated with Tsunami 100, as well as

17  the growth of other microorganisms.

18       12.  The "Food Service line" is the NSC's sister

19  production line.  Also located in the East Plant, it

20  simultaneously processes carrots from the same agricultural

21  fields and the same inbound trucks as those that supply the NSC

22  line, using the same processing methods and types of equipment.

23       13.  During the June 2009 time period at issue, the

24  only difference between the carrots processed on the Food Service

25  line and the NSC line was that the Food Service line continued to

26  use chlorine dioxide to sanitize its hydro-cooler chill water,

27  while the NSC line switched to Tsunami 100.

28       14.  The carrots processed on the Food Service line had

5

1   normal 28-day shelf lives and experienced no unusual spoilage or

2   microbial growth.  Most of the carrots processed on the NSC using

3   Tsunami 100 were spoiled after 12 days and exhibited accelerated

4   levels of *Candida sake* yeast growth as well as other

5   microorganisms.  Bolthouse has never experienced such abnormal

6   decomposition of its carrots at any other time on any of its

7   production lines.

8          15.  Bolthouse promptly notified its customers of the

9   need to remove the contaminated carrots from the market.

10  Bolthouse sent replacement carrots and otherwise compensated its

11  customers for the contaminated carrots.

12         16.  Bolthouse's long-developed and hard-earned

13  reputation was severely damaged.  For example, Loblaw, Canada's

14  largest food retailer, completely stopped making any purchases

15  from Bolthouse, even though Bolthouse had, up to that time, been

16  Loblaw's exclusive supplier of carrots.

17         17.  Bolthouse's lost profits and other damages to date

18  far exceed $20 million, and the discounted present value of

19  future lost profits exceeds $30 million.  Thus, total damages

20  exceed $50 million.

21         18.  In this action, Bolthouse asserts claims for

22  breach of warranty, fraud/misrepresentation, negligent

23  performance of services, and product liability.

24      <u>Insurance Plaintiffs</u>

25         1.  Plaintiffs Houston Casualty Co. and Liberty

26  Surplus Insurance Corp. paid $5 and $4 million, respectively, to

27  Bolthouse under policies issued to Bolthouse.

28         2.  Those insurers assert in this action subrogation

**6**

1   claims against Ecolab.

2      **Ecolab**

3      1.   To manufacture "ready-to-eat" baby carrots,
4   Bolthouse uses water to wash and move carrots throughout its
5   production line.   This production water is referred to as
6   "process water," and is recycled and reused throughout a
7   production shift.   Left untreated, recycled process water can
8   contaminate carrots with bacterial or fungal cells.   To help
9   avoid contamination, Bolthouse adds antimicrobial agents to the
10  recycled process water to inactivate bacterial and fungal cells
11  in the water.

12     2.   There are a variety of antimicrobial agents used
13  to treat process water.   Ecolab manufactures and sells an
14  antimicrobial process water treatment known as "Tsunami 100."

15     3.   Before selecting Tsunami 100, Bolthouse had
16  previously used chlorine dioxide as a process water treatment.
17  But, because of poor finished-product quality and shelf life
18  using chlorine dioxide, Bolthouse switched to Ecolab's Tsunami
19  100 antimicrobial treatment on its entire ready-to-eat baby
20  carrot production line at the West Plant, and portions of its
21  ready-to-eat baby carrot production line at the East Plant.
22  Bolthouse's decision to purchase Tsunami 100 was based on results
23  of two Tsunami 100 test applications.

24     4.   In March 2007 and October 2008, Bolthouse tested
25  Ecolab's Tsunami 100 on its West Plant carrot production line.

26     5.   Based on those test results, Bolthouse decided to
27  use Tsunami 100 on its West Plant carrot production line in May
28  2009.   Using Tsunami 100 at the West Plant, Bolthouse produced

                                  7

1  high-quality carrots with prolonged shelf life compared to those
2  carrots previously produced using chlorine dioxide.

3      6.  Based on its West Plant results, Bolthouse
4  converted portions of the East Plant from chlorine dioxide to
5  Tsunami 100 in June 2009.  Bolthouse did not, however, test
6  Tsunami 100 at the East Plant before switching to it in June
7  2009.

8      7.  After Bolthouse received customer complaints on
9  June 23, 2009 about carrots produced on the East Plant production
10  line, Bolthouse's Tracy Parnell (quality Assurance Manager) and
11  Joe Purcell (Maintenance Manager), and Ecolab's David Walker
12  (Technical Service Representative) inspected the East Plant
13  production line to search for the cause of the complaints.
14  Parnell, Purcell and Walker located significant deposits of
15  organic filth and debris throughout the production line
16  equipment.

17      8.  The June 28, 2009 joint inspection demonstrated
18  that, based on production line design defects and sanitation and
19  maintenance failures, Bolthouse had been manufacturing carrots
20  under unsanitary conditions at the East Plant.  Bolthouse
21  identified several design modifications and repairs necessary for
22  the East Plant production line.  In addition, Bolthouse
23  recognized the need to make certain improvements to its
24  sanitation and maintenance policies and practices.

25      9.  Nevertheless, Bolthouse discontinued using Tsunami
26  100 at both the East and West Plants, despite the fact that
27  Bolthouse continued producing high-quality carrots with prolonged
28  shelf life at the West Plant.

8

1         10.   Ecolab recently learned that, not long before the

2    introduction of Tsunami 100 on the East Plant ready-to-eat baby

3    carrot production line, Bolthouse laid off many sanitation

4    workers.  As a result, Bolthouse understaffed its Sanitation

5    Department which was directly responsible for cleaning and

6    sanitizing the East Plant production line.

7         11.   In November 2008, several months before Bolthouse

8    decided to implement Tsunami 100, Ecolab performed a Plant

9    Sanitation Review at Bolthouse's West Plant and made several

10   recommendations to improve Bolthouse's sanitary operations.

11        12.   Based on the 2007 and 2008 Tsunami 100 test

12   results and Ecolab's October 2008 Plant Sanitation Review,

13   Bolthouse knew that it risked finished-product quality and shelf

14   life if Bolthouse failed to properly clean and sanitize its

15   carrot production lines.

16        13.   At no time did Bolthouse hire Ecolab to design,

17   clean or sanitize Bolthouse's ready-to-eat baby carrot production

18   lines.

19        14.   Under the Good Manufacturing Practices Act ("the

20   Act"), Bolthouse is responsible for the "[o]verall sanitation of

21   the plant" and has a non-delegable duty to maintain its plant in

22   a "sanitary condition" and "in repair sufficient to prevent food

23   from becoming adulterated."  *Id.* at § 110.80.  The Act describes

24   the methods, equipment, facilities, and controls for producing

25   processed food.  The Act applies to food producers, including

26   Bolthouse, and sets out minimum sanitary and processing

27   requirements for producing safe and wholesome food.

28        15.   Bolthouse failed, under the Act, to sanitize all

1  food-contact surfaces as "frequently as necessary to protect

2  against contamination of food," 21 CFR § 110.35(d), and further

3  failed to maintain its East Plant in minimum sanitary condition

4  for producing safe and wholesome food, as required under the Act.

5  Bolthouse's failures to adequately maintain, clean and sanitize

6  its carrot production equipment created a filthy environment

7  unfit for the production of food, contaminating the carrots, and

8  causing poor finished-goods quality and reduced shelf-life.

9       16.   In addition, Bolthouse failed to design its plant

10  equipment "to be adequately cleanable."  21 CFR § 110.40(a).

11  Bolthouse knew or should have known about design flaws,

12  preventing it from ever properly sanitizing its ready-to-eat baby

13  carrot production line.

14      17.   In July 2009, after Bolthouse stopped using

15  Tsunami 100, Bolthouse made several repairs and modifications to

16  its East Plant ready-to-eat baby carrot production line, and

17  updated its sanitation policies and procedures.

18      18.   Whether any failure by Bolthouse to sanitize and

19  otherwise observe clean processing practices, contributed to its

20  entirety, caused any failure of the product in dispute.

21      E.   Relief Sought by Plaintiffs.

22      Damages for costs incurred and lost profits to date of

23  well over $20 million; future lost profits of at least $30

24  million; punitive damages; prejudgment interest; and attorney's

25  fees and costs.

26  VI.  Legal Issues.

27      A.   Uncontested.

28           1.   Jurisdiction exists under 28 U.S.C. § 1332.

1          2.    Venue is proper under 28 U.S.C. § 1392.

2          3.    The parties agree that the substantive law of the

3    State of California provides the rule of decision in this

4    diversity action (Ecolab contends that federal law preempts state

5    law in certain instances as to EPA-required product labels on

6    Ecolab products).

7        B.    Contested.

8        <u>Plaintiffs</u>

9          1.    Breach of contract.

10         2.    Liability.

11         3.    Nature and extent of damages.

12         4.    Whether and to what extent Plaintiff Bolthouse is

13   a food processor within the meaning of the Good Manufacturing

14   Practices Act (21 C.F.R. § 110, et seq.)

15         5.    Whether and to what extent the Good Manufacturing

16   Practices Act applies to Plaintiff Bolthouse.

17         6.    Whether Ecolab breached any promise to, through

18   the use of Ecolab's product, provide advice and expert services,

19   decrease microbial growth and substantially increase the shelf

20   life of Bolthouse carrots.

21         7.    Whether Ecolab misrepresented to Bolthouse that

22   Tsunami 100 would reduce microbial growth and increase shelf

23   life.

24         8.    Whether Ecolab negligently performed its services

25   in providing Tsunami 100 as a substitute for chlorine dioxide in

26   its NSC line.

27         9.    Whether the Tsunami 100 product sold to Bolthouse

28   was defective in its design and manufacture, and whether Ecolab

11

1  failed to warn Bolthouse about the possible risks of Tsunami 100,

2  assuming the foundation that Ecolab knew of any alleged risks.

3      **Defendants**

4      1.    Whether Bolthouse's violations of the Good

5  Manufacturing Practices Act is evidence of negligence per se.

6      2.    Whether Plaintiffs' warnings and/or instruction

7  claims are barred by the doctrine of federal preemption.

8      3.    Whether Plaintiffs' negligence and strict

9  liability claims are barred by California's Economic Loss Rule.

10      4.    Comparative fault.

11 VII. Consent to Magistrate Judge Jurisdiction.

12      1.    The parties have not consented to transfer the

13 case to the Magistrate Judge for all purposes, including trial.

14 VIII.      Corporate Identification Statement.

15      1.    Any nongovernmental corporate party to any action in

16 this court shall file a statement identifying all its parent

17 corporations and listing any entity that owns 10% or more of the

18 party's equity securities.  A party shall file the statement with

19 its initial pleading filed in this court and shall supplement the

20 statement within a reasonable time of any change in the

21 information.

22 IX.  Discovery Plan and Cut-Off Date.

23      A.    Subjects and timing of discovery.

24      1.    The parties have scheduled a mediation for July

25 27, 2011, and have thus agreed to hold off on initiating formal

26 discovery through August 1, 2011 (or until an agreed-upon earlier

27 date if the mediation is postponed or the parties decide to not

28 mediate at this time).  In the meantime, the parties will

1   informally exchange agreed-upon information prior to the
2   mediation.

3          2.    Bolthouse intends to conduct discovery on the
4   following subjects:

5          a.    Other customers of Ecolab that have
6   experienced problems with Tsunami 100;

7          b.    Marketing materials and any other
8   representations made by Ecolab to the public or its customers as
9   to the effectiveness of Tsunami 100 (including the alleged
10  "certain conditions" that are required for Tsunami 100 to be
11  effective);

12         c.    The design and manufacture of Tsunami 100;
13         d.    Testing and research concerning Tsunami 100;
14         e.    Warnings given about Tsunami 100;
15         f.    Regulatory approval of Tsunami 100;
16         g.    Communications (including presentations)
17  between the parties and nonparties concerning Bolthouse's
18  purchase or use of Tsunami 100;

19         h.    The use of Tsunami 100 by Bolthouse,
20  including any related services, recommendations, or testing
21  provided by Ecolab;

22         i.    Any pre- or post-dispute investigation
23  concerning Bolthouse's 2009 carrot spoilage problem or its legal
24  claims;

25         j.    The facts allegedly supporting Ecolab's
26  affirmative defenses;

27         k.    Sales and profits of Tsunami 100; and
28         l.    Insurance coverage.

13

1          3.   Ecolab intends to seek discovery on the following
2   subjects:

3               a.   East and West Plant ready-to-eat baby carrot
4   production line and equipment design, manufacture, maintenance,
5   design changes, improvements, and repairs.

6               b.   East and West Plant baby carrot production
7   from 2005 through 2010.

8               c.   Communications by and within Bolthouse
9   concerning its decision to purchase Tsunami 100.

10              d.   Bolthouse's shelf-life history, expectations,
11   and related information.

12              e.   Customer complaints of abnormal decomposition
13   of Bolthouse products.

14              f.   Photographs and videos depicting the carrot
15   production lines, including photographs taken during the post-
16   discovery investigation.

17              g.   Microbial tests on East and West Plants
18   carrot production lines for previous five years.

19              h.   FDA and other agency investigations at
20   Bolthouse.

21              i.   Process water monitoring information and
22   documentation.

23              j.   Bolthouse's policies and requirements
24   concerning its carrot suppliers and other suppliers.

25              k.   Inventory rotation policies.

26              l.   Bolthouse's cleaning and sanitation practices
27   and policies, cross-contamination controls, weather tracking data
28   for harvesting, temperature and humidity data, and Sanitation

14

1  Standard Operating Procedures for the previous ten years.

2          m.   Bolthouse's purchase of cleaning and

3  sanitation products and services for East and West Plants for

4  previous five years.

5          n.   Bolthouse employee training concerning Good

6  Manufacturing Practices, cleaning, sanitation, personnel hygiene,

7  food safety, and carrot production.

8          o.   Temperature information and related documents

9  for buildings, water, warehousing, transportation, and pallet

10  RFIDs.

11          p.   Bolthouse product recalls for similar

12  contamination issues.

13          q.   Documents and information supporting

14  Bolthouse's alleged damages.

15          r.   Bolthouse's reputation as a supplier of

16  quality carrots and other products, and the alleged damage to

17  Bolthouse's reputation as a result of the carrot quality issues.

18          s.   Other incidents that have affected

19  Bolthouse's reputation as a supplier of quality products.

20          t.   Bolthouse's relationship with Loblaw and

21  other customers, and information related to Bolthouse's claimed

22  damages related to Loblaw and other customers.

23          u.   Communications between Bolthouse and its

24  insurance carriers concerning the claims and allegations in

25  Plaintiffs' Complaint, including claims accepted and paid by

26  insurance carriers, and claims rejected.

27          v.   Bolthouse's layoffs of sanitation workers in

28  2008, and the effect on sanitation practices, policies, and

15

1 results.

2              w.    Changes in Bolthouse corporate culture and

3 carrot production philosophies when the William Bolthouse family

4 sold its majority interest in the business to a Chicago-based

5 private equity group.

6        C.    <u>Issues concerning electronically stored information</u>.

7        1.    No issues have been identified at this time.  The

8 parties will continue to meet and confer about ESI, including the

9 form in which it should be produced.

10       D.    <u>Issues concerning privileges</u>.

11       1.    No issues have been identified at this time.

12       E.    <u>Limits on discovery</u>.

13       1.    The parties have stipulated to a maximum of 30

14 written interrogatories and 30 requests for admission per side,

15 with no limits on requests for production of documents.

16 Responses to written discovery will be due 45 days after service

17 (plus any additional time under Rule 6(d)).

18       F.    <u>Other orders</u>.

19       1.    The parties will file a proposed stipulated

20 protective order to preserve the confidentiality of information.

21 The parties will agree to the form of a protective order to

22 protect confidential information identified and/or produced in

23 discovery.

24       G.    The case is scheduled as follows:

25       1.    The parties have agreed that they shall make their

26 Rule 26(a)(1) initial disclosures on or before June 29, 2011.

27       2.    The parties are ordered to complete all non-expert

28 discovery on or before March 16, 2012.

3.     Plaintiffs are directed to disclose all expert witnesses, in writing, on or before April 16, 2012.  Defendants are directed to disclose all expert witnesses, in writing, on or before May 15, 2012.  Any rebuttal or supplemental expert disclosures by Plaintiffs will be made on or before June 15, 2012.  Any rebuttal or supplemental expert disclosures by Defendants will be made on or before July 16, 2012.  The parties will comply with the provisions of Federal Rule of Civil Procedure 26(a)(2) regarding their expert designations.  Local Rule 16-240(a) notwithstanding, the written designation of experts shall be made pursuant to F. R. Civ. P. Rule 26(a)(2), (A) and (B) and shall include all information required thereunder.  Failure to designate experts in compliance with this order may result in the Court excluding the testimony or other evidence offered through such experts that are not disclosed pursuant to this order.

4.     The parties are ordered to complete all expert discovery on or before August 1, 2012.

5.     The provisions of F. R. Civ. P. 26(b)(4) shall apply to all discovery relating to experts and their opinions. Experts shall be fully prepared to be examined on all subjects and opinions included in the designation and their reports, which shall include every opinion to be rendered and all reasons for each opinion.  Failure to comply will result in the imposition of sanctions.

X.   Pre-Trial Motion Schedule.

1.   All Non-Dispositive Pre-Trial Motions, including any discovery motions, shall be filed on or before August 1, 2012,

17

and heard on September 7, 2012, at 9:00 a.m. before Magistrate
Judge Sheila K. Oberto in Courtroom 8.

    2.   In scheduling such motions, the Magistrate
Judge may grant applications for an order shortening time
pursuant to Local Rule 142(d).  However, if counsel does not
obtain an order shortening time, the notice of motion must comply
with Local Rule 251 and this schedule.

    3.   All Dispositive Pre-Trial Motions are to be
filed no later than August 31, 2012, and will be heard on October
1, 2012, at 10:00 a.m. before the Honorable Oliver W. Wanger, in
Courtroom 3, 7th Floor.  In scheduling such motions, counsel
shall comply with Local Rule 230.

XI.  Pre-Trial Conference Date.

    1.   October 29, 2012, at 11:00 a.m. in Courtroom 3, 7th
Floor, before the Honorable Oliver W. Wanger.

    2.   The parties are ordered to file a Joint Pre-
Trial Statement pursuant to Local Rule 281(a)(2).

    3.   Counsel's attention is directed to Rules 281
and 282 of the Local Rules of Practice for the Eastern District
of California, as to the obligations of counsel in preparing for
the pre-trial conference.  The Court insists upon strict
compliance with those rules.

XII. Motions - Hard Copy.

    1.   The parties shall submit one (1) courtesy paper copy to
the Court of any motions filed.  Exhibits shall be marked with
<u>protruding numbered or lettered tabs</u> so that the Court can easily
identify such exhibits.

///

XIII.   Trial Date.

    1.   December 11, 2012, at the hour of 9:00 a.m. in Courtroom 3, 7th Floor, before the Honorable Oliver W. Wanger, United States District Judge.

    2.   This is a jury trial.

    3.   Counsels' Estimate Of Trial Time:

        a.   Eight to 10 days.

    4.   Counsels' attention is directed to Local Rules of Practice for the Eastern District of California, Rule 285.

XIV. Settlement Conference.

    1.   A Settlement Conference is scheduled for August 7, 2012, at 10:30 a.m. in Courtroom 8 before the Honorable Sheila K. Oberto, United States Magistrate Judge.

    2.   Unless otherwise permitted in advance by the Court, the attorneys who will try the case shall appear at the Settlement Conference with the parties and the person or persons having full authority to negotiate and settle the case on any terms at the conference.

    3.   Permission for a party [not attorney] to attend by telephone may be granted upon request, by letter, with a copy to the other parties, if the party [not attorney] lives and works outside the Eastern District of California, and attendance in person would constitute a hardship.  If telephone attendance is allowed, the party must be immediately available throughout the conference until excused regardless of time zone differences. Any other special arrangements desired in cases where settlement authority rests with a governing body, shall also be proposed in advance by letter copied to all other parties.

1    **4.    Confidential Settlement Conference Statement.**

2  At least five (5) days prior to the Settlement Conference the

3  parties shall submit, directly to the Magistrate Judge's

4  chambers, a confidential settlement conference statement.  The

5  statement should not be filed with the Clerk of the Court nor

6  served on any other party.  Each statement shall be clearly

7  marked "confidential" with the date and time of the Settlement

8  Conference indicated prominently thereon.  Counsel are urged to

9  request the return of their statements if settlement is not

10  achieved and if such a request is not made the Court will dispose

11  of the statement.

12    **5.    The Confidential Settlement Conference**

13  **Statement shall include the following:**

14        a.    A brief statement of the facts of the

15  case.

16        b.    A brief statement of the claims and

17  defenses, i.e., statutory or other grounds upon which the claims

18  are founded; a forthright evaluation of the parties' likelihood

19  of prevailing on the claims and defenses; and a description of

20  the major issues in dispute.

21        c.    A summary of the proceedings to date.

22        d.    An estimate of the cost and time to be

23  expended for further discovery, pre-trial and trial.

24        e.    The relief sought.

25        f.    The parties' position on settlement,

26  including present demands and offers and a history of past

27  settlement discussions, offers and demands.

28  ///

1  XV.   Request For Bifurcation, Appointment Of Special Master,

2  Or Other Techniques To Shorten Trial.

3      1.   The parties have not requested bifurcation.  To the

4  extent that punitive damages are sought, that issue of the

5  amount, if any, of punitive damages, shall be tried in a

6  continuous trial in a second phase before the same jury after the

7  entitlement has been established, both as to liability and the

8  existence of compensatory damages, and the grounds for the

9  recovery of punitive damages, if any.

10  XVI. Related Matters Pending.

11      1.   There are no related matters.

12  XVII.   Compliance With Federal Procedure.

13      1.   The Court requires compliance with the Federal

14  Rules of Civil Procedure and the Local Rules of Practice for the

15  Eastern District of California.  To aid the court in the

16  efficient administration of this case, all counsel are directed

17  to familiarize themselves with the Federal Rules of Civil

18  Procedure and the Local Rules of Practice of the Eastern District

19  of California, and keep abreast of any amendments thereto.

20  XVIII.   Effect Of This Order.

21      1.   The foregoing order represents the best

22  estimate of the court and counsel as to the agenda most suitable

23  to bring this case to resolution.  The trial date reserved is

24  specifically reserved for this case.  If the parties determine at

25  any time that the schedule outlined in this order cannot be met,

26  counsel are ordered to notify the court immediately of that fact

27  so that adjustments may be made, either by stipulation or by

28  subsequent scheduling conference.

1        **2.     Stipulations extending the deadlines contained**
2  **herein will not be considered unless they are accompanied by**
3  **affidavits or declarations, and where appropriate attached**
4  **exhibits, which establish good cause for granting the relief**
5  **requested.**

6        **3.     Failure to comply with this order may result in**
7  **the imposition of sanctions.**

8

9  IT IS SO ORDERED.

10  **Dated:    June 14, 2011**                                    **/s/ Oliver W. Wanger**
                                                      UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28